## IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF GEORGIA
## ATLANTA DIVISION

UNITED STATES OF AMERICA

v.

BERNARD CHAPMAN SYME

Criminal Action No.
1:23-cv-00205-SDG

## <u>OPINION AND ORDER</u>

This matter is before the Court on objections, by Defendant Bernard Syme and by the government, to the calculation in Syme's presentence investigation report (PSR) of "loss" under the Sentencing Guidelines [ECF 8]. For the following reasons, Syme's objections are **SUSTAINED IN PART** and **OVERRULED IN PART**, and the government's objection is **SUSTAINED**.

## I.  BACKGROUND

Syme has pleaded guilty to fraudulently selling, or attempting to sell, timber growing on land that he purported to own but did not.[1] He has admitted to doing so five times, each time with a different logger and on different land.[2] The criminal information to which Syme pleaded guilty charged him for only one of those five

---

[1]   ECF 8, ¶ 4, at 4.

[2]   *Id.* ¶ 62, at 15 (table setting forth five would-be timber purchasers).

fraudulent transactions,[3] but he has agreed that the other four transactions constitute relevant conduct under the Sentencing Guidelines.[4]

The relevant Guideline, U.S.S.G. § 2B1.1, calls for incremental sentencing enhancements based on the "loss" caused by the defendant, with higher amounts of loss resulting in more severe enhancements. The Guidelines themselves do not elaborate on how to determine said "loss," but are accompanied by a Commentary that does. And "loss," according to the Commentary, is "the greater of actual loss or intended loss." U.S.S.G. § 2B1.1 cmt. n.3(A).

Applying this definition, the PSR determined that Syme should receive a sentencing enhancement under § 2B1.1 for causing $443,000 of *intended* loss.[5] Syme and the government have both objected to that determination, asserting that Syme deserves a lower enhancement for causing $53,000 of *actual* loss.[6] Syme objects to the PSR's use of intended loss on two grounds: first, he argues, under the recent Eleventh Circuit case *United States v. Dupree*, 57 F.4th 1269 (11th Cir. 2023) (en banc), intended loss cannot be considered in calculating loss under § 2B1.1;[7]

---

[3]    *Id.* ¶¶ 1–2, 8, at 4–5.

[4]    *Id.* ¶ 8(iii)(b), at 5 (stating that Syme stipulated to a loss amount encompassing "all relevant conduct").

[5]    *Id.* ¶ 62, at 15.

[6]    *Id.* at 43.

[7]    *Id.* at 18.

second, he argues, even if intended loss is considered, the intended loss here is not

$443,000 but $0.[8] The government objects only on the second of these grounds.[9]

## II.    DISCUSSION

### A.    Legal Standard

A court may only apply a sentencing enhancement after independently establishing the enhancement's factual basis. *United States v. Foley*, 508 F.3d 627, 633 (11th Cir. 2007). A sentencing enhancement for loss amount must be supported by a preponderance of the evidence, *id.*, and the loss amount must be based on the court's "reasonable estimate, given the available information." *United States v. Orton*, 73 F.3d 331, 334 (11th Cir. 1996).

### B.    Even After *Dupree*, Courts Must Defer to the Commentary on "Loss" Under § 2B1.1.

Syme first objects to the PSR's use of intended loss on the ground that it is precluded by the Eleventh Circuit's recent decision in *Dupree*. That objection is overruled. As discussed below, Syme's first objection does not implicate *Dupree* as fully as he may think. The Court nevertheless begins its analysis with *Dupree* because it is a seminal case on Guidelines interpretation in this Circuit.

*Dupree* limited the situations in which the Commentary could be used to interpret the Guidelines. More specifically, *Dupree* held that courts could only

---

[8]    *Id.* at 21.

[9]    *Id.* at 15.

consult the Commentary when a given Guideline was ambiguous. The pre-*Dupree* rule, laid down by the Supreme Court in *Stinson v. United States*, required courts to defer to the Commentary for every Guideline, ambiguous and unambiguous, so long as the Commentary did not "violate the Constitution or a federal statute," and was not "plainly erroneous or inconsistent" with the Guidelines. 508 U.S. 36, 44–45 (1993). *Dupree*, by permitting deference to the Commentary for only "genuinely ambiguous" Guidelines, *id.* at 1274, in effect held that the part of *Stinson* requiring Commentary deference for unambiguous Guidelines had been overruled.[10] *Dupree*, 57 F.4th at 1284 (Grant, J., concurring in the judgment).

The practical result of *Dupree* is that courts in the Eleventh Circuit must now interpret the Guidelines in two steps. First, at what might be called the *Dupree* step, courts must either determine the Guidelines' meaning without reference to the Commentary or "exhaust all the traditional tools of construction" in the attempt. *Id.* at 1275 (majority opinion). No uncertainty in the Guideline means no deference, and the Commentary to that Guideline is a dead letter. *Id.* But if there *is* uncertainty in the Guideline, then courts move to what might be called the *Stinson* step of the analysis and ask whether the Commentary's resolution of the uncertainty is "plainly erroneous or inconsistent" with the Guidelines. *Id.* at 1274. Only if there

---

[10] More precisely, *Dupree* held that the Supreme Court had partially overruled *Stinson* by implication in *Kisor v. Wilkie*, 588 U.S. ---, 139 S. Ct. 2400 (2019).

is no plain error or inconsistency will the Commentary control. *Id.* Put another way, courts must ignore the Commentary in two situations: when a Guideline is clear on its own (*Dupree*), and when its Commentary is obviously wrong (*Stinson*).

Moving then to Syme's first objection: Syme asserts that there is no uncertainty in § 2B1.1(b)(1) because its "unambiguous plain text" clearly indicates that "loss" means actual and not intended loss.[11] The Court's preliminary question here is whether Syme's objection arises under *Dupree* or *Stinson*. That is, does Syme mean to argue that the Court cannot defer to the Commentary because the plain meaning of the word "loss" in § 2B1.1(b) is unambiguous? Or, does he mean to argue that the Commentary does not control, regardless of whether "loss" is ambiguous, because the Commentary's interpretation of "loss" as "the greater of actual loss or intended loss" is plainly inconsistent with § 2B1.1(b)(1)'s text?

Upon examination, the Court concludes that Syme's position here is the latter: that "loss" in § 2B1.1(b)(1), whatever it may mean, does not "include the concept of 'intended loss.'"[12] Thus, Syme's objection is better construed as arising under *Stinson* than under *Dupree*. To invoke *Dupree*, Syme must argue that the plain text of § 2B1.1(b)(1) is unambiguous and reasonably subject to only one interpretation; in other words, he must argue that loss under § 2B1.1(b)(1) can be

---

11   ECF 8, at 18.

12   *Id.* at 19.

reasonably calculated only one way. To argue under *Dupree* is to be positive: to assert that the Guideline *must* mean *this*. To argue under *Stinson*, by contrast, is to be negative: to protest that the Guideline *can't* mean *that*. And Syme's posture here is negative. His objection boils down to his conviction that "loss" *cannot* mean "intended loss." This can be seen in such statements as "[o]nly those in the legal profession, blinded by our own forays into legal fictions and overuse of legalese, would entertain the idea that the word 'loss' might include the concept of 'intended loss.'"[13] It can also be seen in his reliance on two recent (non-binding) decisions on § 2B1.1(b)(1), neither of which was willing to affirmatively propound a generally applicable definition of "loss" under § 2B1.1(b)(1).

The first case, *United States v. Banks* from the Third Circuit, held that the Commentary's gloss on "loss" in § 2B1.1(b)(1) was entitled to "no weight" because the Commentary "expand[ed] the definition of 'loss'" beyond its ordinary meaning. 56 F.4th 246, 258 (3d Cir. 2022). But *Banks* explicitly did *not* decide whether "loss" was ambiguous. It did not matter in *Banks* "whether one clear meaning of the word "loss" emerge[d] broadly, covering every application of the word." The holding in *Banks* was that whatever meaning of "loss" might emerge—

---

[13]    *Id.*

one or many, clear or unclear, broad or narrow, universal or particular—that meaning could not possibly encompass the idea of "intended loss."

The second case on which Syme relies, *United States v. Patel* from the Southern District of Florida, was effectively an adoption of *Banks* by a court in this Circuit. 2023 WL 5453747 (S.D. Fla. Aug. 23, 2023). The analysis in *Patel* mirrors the analysis in *Banks*, to which *Patel* heavily cites. *Patel*—like *Banks*—held that courts "cannot consider" the Commentary to interpret § 2B1.1(b)(1), *id* at *3, because the Commentary "expands the concept of 'loss' beyond its ordinary meaning," *id.* at *2. Like *Banks*, therefore, *Patel* determined, not what "loss" means, but what it does not mean. Like *Banks*, *Patel* stands, not for the idea that the text of § 2B1.1(b)(1) unambiguously requires courts to calculate loss in a particular way, but for the idea that, whatever the calculation, intended loss cannot possibly be part of it.

*Banks*, *Patel*, and Syme all press the same point: the Commentary's reliance on "intended loss" is plainly inconsistent with any reasonable construction of the word "loss," and thus the Commentary does not control the interpretation of § 2B1.1(b)(1). It is a point that arises under *Stinson*, not *Dupree*. Thus, *Dupree* does not necessarily obsolete those cases that, though relevant to Syme's objection, were decided before *Dupree*. In other words, if the Eleventh Circuit has previously opined on whether the Commentary is plainly inconsistent with § 2B1.1(b)(1)'s

text, *Dupree* does not undermine the *reasoning*[14] in those opinions. One such opinion is *United States v. Moss*, which explicitly held that the Commentary's interpretation of "intended loss … is binding on the courts because it does not contradict the plain meaning of the text of the Guidelines." 34 F.4th 1176, 1190 (11th Cir. 2022). *Moss* means that in the Eleventh Circuit, as regards § 2B1.1(b)(1), *if* the Commentary applies, then the Commentary controls—even after *Dupree*. Thus, to the extent that Syme argues that the PSR's reliance on intended loss is plainly inconsistent with § 2B1.1, that argument is precluded by *Moss*.[15]

But *Moss* does not address whether, after *Dupree*, the Court has any business consulting the Commentary to define "loss" in the first place. To resolve that issue, the Court must do what *Banks* and *Patel* did not, and decide if "loss" is ambiguous. That analysis begins, as it must, "with the text" of the Guideline, guided "by the ordinary-meaning canon, 'the most fundamental semantic rule of interpretation.'" *United States v. Garcon*, 54 F.4th 1274, 1277 (11th Cir. 2022) (en banc) (quoting Antonin Scalia & Bryan Garner, Reading Law: The Interpretation of Legal

---

[14]  As distinct from *applicability*: *Dupree* does, of course, effectively moot those opinions that rely on the Commentary to interpret unambiguous Guidelines.

[15]  In so ruling, this Court parts ways with *Patel*. *Patel* acknowledged the Eleventh Circuit's holding in *Moss*, but distinguished it as improperly reliant on the Commentary. 2023 WL 5473747, at *3. *Patel*, in other words, considered *Moss* to have been implicitly overruled by *Dupree*. *Id.* This Court respectfully reads it differently.

TEXTS 69 (2012)—it begins, in other words, with the dictionary, *see id.* at 1278. And "loss," according to Black's Law Dictionary, comes in 35 different varieties.[16] Loss might be economic or noneconomic, direct or indirect, foreseeable or not, frequent or not; economic losses themselves can be divided into the deductible and the nondeductible, the net and the gross, the realized and the unrealized; and in calculating losses, one might follow the formula for expectation damages or for restitution.[17] This last distinction in particular is pervasive. Dictionary[18] after dictionary[19] defines loss both as the failure of an opportunity to acquire possessions in the future, and as the diminution of possessions already acquired in the past.[20] These two definitions of loss cannot be easily reconciled: they are calculated using different formulas, *see, e.g.*, *AcryliCon USA, LLC v. Silikal GmbH*, 985 F.3d 1350, 1368 (11th Cir. 2021) (explaining the "fundamental difference" between how restitution and expectation damages are measured), and it is unclear

---

[16] *Loss*, BLACK'S LAW DICTIONARY (11th ed. 2019).

[17] *Id.*

[18] *Loss*, OXFORD ENGLISH DICTIONARY, https://www.oed.com/dictionary/ loss_n1 (last visited Mar. 11, 2024) (defining "loss" as both "[f]ailure to gain or obtain" and "[d]iminution of one's possessions").

[19] *Loss*, MERRIAM-WEBSTER DICTIONARY, https://www.merriam-webster.com/ dictionary/loss (last visited Mar. 11, 2024) (defining "loss" as both "failure to gain" and failure "to keep or maintain").

[20] The Court notes that these two varieties of loss might be roughly characterized as "intended" and "actual" loss.

from the text of § 2B1.1(b)(1) which formula should apply. The dictionaries suggest that "loss" contains more than one ordinary meaning.

Nor does a single ordinary meaning of "loss" arise after applying the canons of construction. *See Heyman v. Cooper*, 31 F.4th 1315, 1319 (11th Cir. 2022) ("The canons of construction often … serv[e] as useful tools to discern [a written provision's] ordinary meaning."). For example, it is often helpful to "presume that identical words used in different parts of the same act are intended to have the same meaning." *Garcon*, 54 F.4th at 1278; *see also* SCALIA & GARNER, *supra*, at 170. But "loss" appears in the Guidelines under the offenses of burglary, trespass, robbery, extortion, bribery, racketeering, price-fixing, and various tax offenses; as well as in the context of aggregating harms, calculating restitution, and justifying upward variances. The Guidelines likewise discuss "loss" in general, but also specify "loss to the victim," U.S.S.G. § 2B3.2(b)(2), "pecuniary loss," U.S.S.G. § 2R1.1(d)(1), "loss to the government," U.S.S.G. § 2C1.1(b)(2), and "tax loss," U.S.S.G. § 2T1.1(a)(1). And "tax loss"—the only kind of loss defined in any detail within the Guidelines themselves—changes depending on the crime. Where the crime is the filing of a fraudulent tax return, "tax loss" is "the loss that would have resulted had the offense been successfully completed"—in other words, *intended* loss. U.S.S.G. 2T1.1(c)(1). But where the crime is the failure to file a tax return at all, "tax loss" is "the amount of tax that the taxpayer owed and did not pay"—in

other words, *actual* loss. U.S.S.G. 2T1.1(c)(2). Finding a single meaning of "loss" that would give full meaning to every Guideline provision in which that word appears is beyond this Court's skill.

Nor does any other canon of construction seem to resolve the ambiguity. The policy concerns in the Guidelines' prefatory materials, for example, are stated at too high a level of abstraction to help in the construction of a particular word. SCALIA & GARNER, *supra*, at 217 ("A preamble, purpose clause, or recital is a permissible indicator of meaning."). And the Court prefers to err on the side of defining a general term like "loss" more generally, lest it be deprived of its "full and fair scope." *Id.* at 101 ("General terms are to be given their general meaning."). With ambiguity remaining after consulting dictionaries, scrutinizing the Guidelines, and exhausting the interpretive tools at its disposal, the Court must accordingly conclude, as did the Sixth Circuit in *United States v. You*, that "the definition of loss has no single right answer." 74 F.4th 378, 397 (6th Cir. 2023). Because "loss" is ambiguous, the Court interprets it in accordance with the Commentary as required by *Moss*.

**C.    Under the Commentary, Syme Caused a "Loss" of $53,000.**

The Commentary instructs that the loss attributable to Syme is the greater of actual or intended loss. The actual loss amount as it stands now is undisputed:

the parties agree it is $53,000.[21] What *is* disputed is the intended loss amount: the PSR calculates it as $443,000, while Syme and the government both object and contend that it is $0. These objections are sustained.

The Commentary defines "intended loss" as "the pecuniary harm that the defendant *purposely* sought to inflict." U.S.S.G. § 2B1.1, cmt. n.3(A)(iii) (emphasis added). Put differently, a defendant causes an intended loss only where he acts with the *purpose* of inflicting pecuniary harm. Thus, to determine intended loss, courts must inquire into the defendant's *purpose*—they must peer into the defendant's mind and determine his subjective intent.

Other Circuits have said so explicitly. Then-Judge Gorsuch, writing for the Tenth Circuit, concluded after an exhaustive examination of § 2B1.1 that "the *mens rea* standard for 'intended losses' is just what the plain language and structure of the guidelines suggest—requiring an inquiry into the defendant's purpose." *United States v. Manatau*, 647 F.3d 1048, 1056 (10th Cir. 2011). More recently, the Seventh Circuit affirmed its long-held stance that intended loss is calculated with "a focus on the defendant's subjective intent," noting the Sentencing Guidelines' express approval of *Manatau* in the 2015 amendments. *United States v. Klund*, 59

---

[21]  The final actual loss amount will be determined at the continued sentencing hearing. By order entered February 12, 2024, the Court has directed the government to inquire further concerning certain loss and restitution issues. ECF 11.

F.4th 322, 327 (7th Cir. 2023). Other Circuits taking the same position include the Third, the Fifth, and the Eighth. *United States v. Yeaman*, 194 F.3d 442, 460 (3d Cir. 1999) ("Intended loss refers to the defendant's subjective expectation."); *United States v. Sanders*, 343 F.3d 511, 527 (5th Cir. 2003) (requiring the government prove intended loss "by a preponderance of the evidence that the defendant had the subjective intent to cause the loss that is used to calculate his offense level"); *United States v. Wells*, 127 F.3d 739, 746 (8th Cir. 1997) (defining intended loss as "the loss the defendant intended to cause to the victim").

And though the Eleventh Circuit has not been quite as direct as *Manatau*, its holdings on calculating loss under § 2B1.1 are consistent with the idea that the critical inquiry is the defendant's subjective intent. For example, the Eleventh Circuit has distinguished between loss in cases of theft, where "there is almost always an *intent* to deprive the victim of the value of the property taken," and loss in certain kinds of fraud, where "the perpetrator … *intend[s]* no loss." *United States v. Tatum*, 138 F.3d 1344, 1346 (11th Cir. 1998) (emphasis added). It has further instructed that loss in fraud cases depends on the "nature of the scheme." *Orton*, 73 F.3d at 334. The Eleventh Circuit has accordingly implied that the intended loss would be zero where a perpetrator obtains a contract through fraud, but fully "intends to perform and to cause no loss to the victim." *Id.*

And that, Syme and the government argue, is exactly what happened here: Syme fraudulently obtained timber sales contracts that he nevertheless fully intended to perform and from which he intended that the loggers suffer no loss. Syme's scheme, they insist, was "to fraudulently pre-sell the timber so he could use the lumber advances to finance the purchase of the land from which the timber would be harvested."[22] The scheme worked something like this: Syme would begin negotiating with a landowner about buying a tract of land. At the same time, Syme would begin negotiating with a logger about selling the timber on the land that he wanted to buy. If the logger asked for verification that the timber was Syme's to sell (and it never was), Syme would forge documents as necessary to show that he owned the land. As part of the timber sale, Syme would require a cash advance, which, upon receipt, was immediately used to finance Syme's purchase of the land. If the scheme worked, Syme would have the land, the landowner the full purchase price, and the logger the timber that he paid for.

Syme's story, which at first struck the Court as far-fetched, is nevertheless wholly consistent with the evidence. Here are summaries of Syme's five fraudulent transactions:

1.  In Polk County, Georgia, Syme fraudulently sold timber rights for $175,000.[23] At the time of the sale, he was also negotiating

---

22  ECF 8, at 24; *see also id.* at 16–17.

23  *Id.* ¶ 11, at 7.

to buy the underlying land for $150,000 down,[24] with the rest to be financed by the landowner.[25] Syme never closed on the land, but eventually paid the $175,000 back to the logger of his own accord.[26]

2.    In Elbert County, Georgia, Syme tried to fraudulently sell timber rights for $50,000.[27] At the same time, Syme was negotiating to buy the underlying land, and had convinced the landowner to finance the sale.[28] The logger broke off negotiations upon being warned that Syme was a "crook,"[29] and Syme never closed on the land.[30]

3.    In Crawford County, Georgia, Syme fraudulently sold timber rights for $50,000.[31] By the time the timber was cut, Syme had closed on and paid for the underlying land.[32]

4.    In Brunswick County, Virginia, Syme tried to fraudulently sell timber rights for a $115,000 cash advance, with the full price to be determined at harvesting.[33] At the same time, he was negotiating to buy the underlying land for $115,000 down, with the rest to be paid in monthly installments.[34] The logger learned

---

[24]   *Id.* ¶ 29, at 10.

[25]   *Id.* ¶ 25, at 10.

[26]   *Id.* at 17, 24; *see also id.* ¶ 15, at 7.

[27]   *Id.* ¶ 19a, at 8.

[28]   *Id.* ¶ 18, at 8.

[29]   *Id.* ¶ 19a, at 8.

[30]   *Id.* at 25.

[31]   *Id.* ¶ 44, at 12.

[32]   *Id.* ¶ 46, at 13.

[33]   *Id.* ¶ 54, at 14.

[34]   *Id.* ¶ 60, at 15.

of Syme's fraud and did not go through with the sale.[35] Syme paid $5,000 in earnest money on the land but never closed.[36]

5. In Halifax County, Virginia, Syme fraudulently sold timber rights for $53,000.[37] He later closed on and paid for the underlying land.[38]

The PSR shows that each time Syme tried selling timber, he also took substantial steps toward buying the underlying land. Twice, he actually did. On only one property was any timber cut—and by the time it was, the property belonged to Syme. To date there is evidence that on only one property did a logger suffer an actual loss—and Syme eventually bought that property as well. On only one occasion did Syme sell timber on land he did not buy—and on that occasion, Syme paid the entire timber sale price back to the logger on his own.

Syme's behavior is not only consistent with an intent to leverage timber sales to buy land, but also *in*consistent with an intent to take the loggers' cash and run. If Syme's only intent had been to receive cash advances on timber sales and disappear, there would have been no need for him to interface with the true landowners at all, much less negotiate purchase agreements using his real name.[39]

---

[35] *Id.* ¶ 57, at 14.

[36] *Id.* ¶ 60, at 15.

[37] *Id.* ¶ 61a, at 15.

[38] *Id.*

[39] *Id.* at 24.

16

Syme's behavior only makes sense if his intent was always to finance his purchase of the land by selling its timber, as he was twice able to do. And if Syme contracted—however fraudulently—with loggers intending that the loggers harvest timber in full satisfaction of their contracts, then Syme did not intend to cause the loggers a loss. The Court thus finds, under a preponderance of the evidence, that Syme is responsible for an intended loss of $0. Applying the Commentary instruction that the "loss" caused by Syme for purposes of his sentencing enhancement under § 2B1.1(b)(1) is the greater of the actual loss (currently $53,000) and the intended loss of $0, the actual loss as finally calculated at the continued sentencing hearing will control.

## III.  CONCLUSION

Syme's objections to the PSR [ECF 8] are **SUSTAINED IN PART** and **OVERRULED IN PART**. The government's objection is **SUSTAINED**.

**SO ORDERED** this 11th day of March, 2024.

_____
Steven D. Grimberg
United States District Judge